HOUPY v. M. L. & T. R. R. & S. S. CO.

(January 21, 1929. Opinion and Decree.)
(February 25, 1929. Rehearing Refused.)
(March 26, 1929. Decree Supreme Court,
Writ of Certiorari and Review Refused.)

Suthon, Zengel and Daigle, of New Orleans, attorneys for plaintiff, appellee.

Denegre, Leovy and Chaffe, of New Orleans, attorneys for defendant, appellant.

STATEMENT OF THE CASE.

GLEASON, J., ad hoc. This is an action wherein Mrs. Myrtle Schulingkamp Houpy, dative tutrix of the minor children of John Louis Schulingkamp, seeks to recover from the defendant corporation the sum of $24,-500.00 for damages growing out of the death of the father resulting from his having been killed by a switched car of defendant corporation about 12:45 p. m. on March 26, 1926, on the second main line of the Public Belt Railroad of the City of New Orleans on the river front between Madison and St. Ann Streets. It is alleged that the car was switched by what is commonly known as being "kicked", and that it was left unattended by a brakeman, ran down the plaintiff's father, and that, had the car been attended by a brakeman, he could have prevented the accident.

The defendant alleges that the process of kicking a car for switching purposes in the location where the accident happened was a common practice adopted not only by defendant corporation but by all railroads; that the father of the plaintiff minors was a brakeman for a long period of time working for the Public Belt Railroad; that he was familiar with this practice, assumed the risk of his employment, and, in the alternative, if they were guilty of negligence, that the deceased was guilty of contributory negligence which precluded a recovery.

A jury was prayed for but waived, and the matter was tried before the district court. Judgment was rendered for the benefit of each minor in the sum of $5,-000.00, and with recognition of the subrogation of the Public Belt Railroad to the

sum of $1708.76, representing the amount of compensation paid the heirs of the deceased. From this judgment, defendant appealed.

## OPINION.

The location where the accident happened is on the river front of the City of New Orleans between where St. Ann and Madison Streets, if prolonged across the river front and beyond Decatur Street, would extend. At this location, there is a series of twelve tracks, and the location between the prolongation of St. Peter Street and Governor Nicholls Street is used by the various railroads, including the Public Belt Railroad, for whom the father of the plaintiffs worked as a switchman, and the M. L. & T. R. R. & S. S. Co., as a railroad yard in which switching is done during the entire twenty-four hours of the day.

In the discussion of this case, we are concerned only with the tracks of the M. L. & T., the Public Belt and the two L. & N. tracks. The first M. L. & T. track, if taken at a prolongation of Madison Street, is nearer to the river and adjoining the two tracks of the Public Belt Railroad, which adjoin each other, and then follows the through tracks of the L. & N. Railroad, and then a number of tracks of the M. L. & T. From about midway of the prolongation of Madison and St. Ann Streets, a track of the M. L. & T. crosses over from its track nearest to the river on an angle towards downtown, and crosses into what is known as the "scale house" of said railroad, situated on the inner track and near the corner of the prolongation of St. Philip Street.

At the time of the accident, the switching crew of the M. L. & T. had moved a train of cars from the track nearest the river over across the Public Belt tracks and across the L. & N. tracks to the scale house, and were on their way back for the purpose of diverting one of the cars ahead of the engine to the inner or woods side track of the Public Belt. This is known as the exchange or delivery track whereat the M. L. & T. always delivers cars to be belted by the Public Belt Railroad.

The train to which Schulingkamp was assigned was the Public Belt switching or delivery train on the Public Belt track nearest to the river and adjoining the one upon which the car was switched. He had made, in conjunction with his crew, deliveries of certain cars below the point of Dumaine Street, and had returned with the engineer, he being then on the engine, to the cars which had remained on the Public Belt delivery track, for the purpose of coupling up the engine to the remaining cars and then proceeding downtown. At this juncture, the engine of the Public Belt Railroad was about fifty feet or more ·on the uptown side of what is known as the "double slip switch." That is a switch situated at the junction of the crossing between the M. L. & T. track, which runs on an angle, as we have aforedescribed, and the inner Belt track or hop-leg track, as it is called in railroad parlance. In order to execute the delivery of this car of pipe which caused the injury to the hop-leg Public Belt track, it was necessary to divert it at the double slip switch situated at the junction of the Public Belt and the M. L. & T. as aforedescribed. The process used on this day, and one which the testimony shows has been universally practiced, was to kick the car from the engine, have it take the switch as it reached the junction, which then diverted it from the M. L. & T. to the hop-leg or Public Belt delivery track. At this time, and at the time the Public Belt

Railroad engine returned for the purpose of picking up its parked cars, the switchman of the M. L. & T. was approaching the switch for the purpose of throwing it preparatory to the deflection of the car. The foreman of the crew of the Public Belt Railroad engine (the crew in charge of Schulingkamp's switching program) was standing between the L. & N. and the Public Belt tracks about fifty or sixty feet below the switch. He was looking in the direction of downtown, from which the switched car was coming, as he says, watching the car to be switched. The foreman of the other switching crew was standing opposite him between the L. & N. tracks watching these tracks, because they were through tracks, so as to be sure they were clear.

Roberts, the foreman of the Belt crew, testifies that he watched this car until it passed him, and that, as it passed him, as can readily be seen by the angle of the track, it hit the switch, was deflected to the Public Belt track to its ultimate destination, and, from the moment the car passed him, his vision was obscured, and he could not possibly see where Schulingkamp was. Therefore he was clearly not in a position to see where Schulingkamp was from the time the car was kicked until after Schulingkamp was killed.

The switchman who threw the switch for the M. L. & T. testified that he saw Schulingkamp pass on the engine just prior to his throwing the switch, and that Schulingkamp either saw him or should have seen him, as he was obviously going to throw the switch.

Under any circumstances, Schulingkamp had been a brakeman engaged in traffic in this yard for eight years or more and was thoroughly familiar with the processes used, and it was either clear to him, or should have been clear to him, that the maneuver being made could have had for its purpose only one object and that was to deflect the car onto the Public Belt Railroad.

While there is testimony going to show that, had the car not been deflected onto the Public Belt, it would have continued on the oblique line of the L. & N. until deflected by a curve onto the straightaway of the M. L. & T., we do not consider this circumstance of special importance. The important fact is that Schulingkamp either knew or, from his experience, should have known that that car was likely to go on either track, and that he should have been on his guard to protect himself against its going on the Public Belt and to keep off the track.

Not a single one of the witnesses places the location of Schulingkamp, immediately preceding the accident, with any degree of certainty, except the engineer of the Belt train crew, who says that he looked up and saw Schulingkamp about, as he expressed it, to give him a signal, and at that time he had one foot on the Belt hop-leg track, but that the oncoming car was only about seven feet from him, and it was too late to do anything.

Roberts made one statement to the effect that, prior to the accident, he had seen Schulingkamp about midway of his tender with his arms folded and one foot on the hop-leg Belt track. Exactly how far ahead of the switching maneuver this was, or what relation it might have had to the time of the maneuver, is not in any sense clarified. It certainly could not have been immediately preceding the maneuver, because Roberts' own testimony shows that it was impossible for him to have seen Schulingkamp at this particular juncture; so that, as far as this record shows, nobody knows where Schulingkamp was between

the time the maneuver was executed and the time the car was within seven feet of him, when the engineer of his own switching crew saw him. Non constat that he backed into the track just at that 'moment. That he did so is rendered plausible by the testimony of Swanson, foreman of defendant's switching crew, who said that he himself got very excited and that when he reached Schulingkamp, he asked "Johnny, how did this happen?" And Schulingkamp said, "All I remember that I coupled up my air hose and when I backed out the car hit me."

One of the duties of Schulingkamp was to couple the air hose and then give the signal to go ahead. The parked cars picked up by the engine were all on the uptown side of the engine, and Schulingkamp had a clear view of all the tracks towards downtown, not only the track upon which the *Public Belt train* would proceed, but also the hop-leg track and the M. L. & T. tracks from which the car was switched.

There was some testimony intended to elicit the fact that, in order to give the signal to the engineer to go ahead, Schulingkamp had to get out on the other track. As a matter of fact, there was a brakeman on the rear of the train to give the necessary signals to Schulingkamp, and, as the Belt engine was going downtown, it was not necessary for him to get on the track at all, and, if he did, it was incumbent upon him, as an experienced brakeman familiar with the process of switching cars, to look and be sure before he got in the way of a possible oncoming car on a track universally used for switching purposes.

The only charge of negligence is that the defendant's car ran free, that is, unattended by a brakeman on top of the car. It is not charged that kicking cars is in itself negligence when kicked in the yard, but it is charged that the car should be attended by a brakeman who can either call out to a person in jeopardy or stop the car. There is nothing whatever in this record to indicate that, even ,if a brakeman had been on the car, that he could have done either of those two things, as there is nothing to show the instant upon which Schulingkamp got into jeopardy.

There is not a word of evidence to show that Schulingkamp was in an imminently dangerous position at the time the maneuver was started, and, even if it were shown that he was standing on the adjoining track near his engine, this would not have indicated danger to a switching crew, because of the fact that this is a common experience of everyday occurrence.

There was some testimony to show that this maneuver was a flying switch maneuver, in violation of the regulations of the railroad company itself, and considerable time was devoted to a discussion of cases dealing with flying switches. The flying switch prohibited by the railroad regulations is an entirely different maneuver. In the flying switch maneuver, the engine precedes the car, turns the car loose, accelerates its speed so as to cross the switch in time to permit the switch to be turned so that, when the detached car reaches it, it can take the switch "on the fly", so to speak, and be shunted onto another track. The particular danger of this maneuver is because of the likelihood of people walking in behind the engine. The testimony explains fully the distinction between these two maneuvers.

The plaintiff founds his case on the assumption that it was the duty of the railroad company to use the best possible means in the maneuvering of its car for the protection of human life, and that the

method of switching a car by the kicking process was not the best method; that it is inherently dangerous and that the better method is to kick the car with an attendant on the car in a ready position to avoid an accident such as the one in this case.

The answer thereto is that we are living in an age of machinery when speed of operation and economy are essential commercial elements, and, while no one has a right to wantonly disregard the rights of others, those who accept positions around machinery in railroad yards, where switching arrangements are constantly going on, and who are fully aware of the risks they take, assume same. In this complex civilization, life cannot exist, as we live it, without some human toll being paid as the price of progress and economy.

Cases of a nature similar to this have been before the courts before, and in all cases to which our attention has been directed, the courts have held that a maneuver such as this in a railroad yard, and in its relation to members of the crew, familiar with its processes, it is not negligence.

In Travis vs. Kansas City Southern Ry. Co., 121 La. 885, 46 So. 909, the Court said:

"The defendant railway has never lighted its switch-yards at Shreveport, Kansas City or elsewhere. The evidence shows that, among the prominent railroads of the country, some do and others do not light their yards with electricity. It is not shown that a majority of the railroads follow this practice, which, we are bound to know, is of comparatively recent date. Railroads which use appliances of a kind in common use are not guilty of negligence. The rule is that, where the employer does what is commonly and generally done by persons or corporations in the same general line of business, he is not guilty of actionable negligence. Elliott on Railroads, (2d Ed.) Sec. 1274; Towns vs. Railroad Co., 37 La. Ann. 634, 55 Am. Rep. 508. In operating an unlighted yard, the defendant was doing what railroads had done from the beginning, and what its experience of 10 years demon-

strated could be done with comparative safety to its trainmen. During that long time, no like accident had happened, and its switchman had been able to see obstructions on the tracks in time to prevent collisions disastrous to life or limb. Doubtless a well-lighted yard is safer than a yard not lighted; but the railroad was not bound to employ the best possible means and appliances. Id. * * * Although Travis started to work in the evening and was killed next morning, he as an experienced switchman, who had worked in both lighted and unlighted yards, must have known the situation, and therefore assumed the risk."

And in Toledo, St. L. & W. R. Co. vs. Allen, 276 U. S. 165, the Court said:

"The members of the switching crew had a right to believe that he would keep out of the way of the shunted car. Aerkfetz vs. Humphreys, supra. In any event, plaintiff assumed the risk. He was familiar with the yard and the width of the space between the tracks and knew that cars were liable to be shunted without warning to him. The dangers were obvious and must have been fully known and appreciated by him. Boldt vs. Pennsylvania R. R. Co., supra, (245 U. S. 441, 38 S. Ct. 139, 62 L. Ed. 385); Ches. & Ohio Ry. vs. Nixon, supra, (271 U. S. 218, 46 S. Ct. 495, 70 L. Ed. 914); Randall vs. Baltimore & Ohio R. R. Co., supra, (109 U. S. 478, 3 S. Ct. 322, 27 L. Ed. 1003); Tuttle vs. Detroit, G. H. & Milwaukee Railway, supra, (122 U. S. 189, 7 S. Ct. 1166, 30 L. Ed. 1114). * * * There is nothing to sustain a finding that plaintiff was in any danger other than such as was usually incident to his employment, or that any member of the crew knew or had any reason to believe that he was oblivious of the situation. Illinois Central Railroad Co. vs. Ackerman, (C. C. A.) 144 Fed. 959, 962. In the absence of knowledge on their part that he was in a place where he was liable to be struck and oblivious of that danger, they were not required to vary the switching practice customarily followed in that yard or to warn or to take other steps to protect him. There is no evidence to sustain the allegation that the other employees saw, or negligently failed to discover, plaintiff in a 'position of peril and oblivious thereof'."

In Carlo vs. Bessemer & L. E. R. Co., 293 Pa. 343, 350, 143 Atlantic 5, the Court said (quoting from page 7):

"Appellee assumed the risk of dangers incident to his employment. He was of mature years, and had been employed for some time by this company. He knew generally of the duties devolving on brakemen. The switching movement was an ordinary one, with nothing unusual about it. The engine and car were moving at a reasonable rate of speed, but in every yard employees must be aware that cars and engines move in all directions at irregular intervals. It is one of the usual incidents of such places, and employees assume the risk of accidental hazards incident to such employment."

It will do no good to discuss those cases dealing with the making of flying or kick switches over public streets, as the facts are different, the obligations to the pedestrian different, and the law applicable thereto not the same.

There was some testimony to show that at times, especially at the noon hour, workmen from the river were in the habit of crossing the tracks of this particular yard. We do not see what bearing that can have on this case, as we are dealing with a switchman.

Plaintiff and appellee further contends that the speed of the kicked car, which was eight or ten miles an hour, was in excess of the five-mile limitation of speed on the river front fixed by a city ordinance. This ordinance was not pleaded, was objected to when offered, and the objection should have been sustained. It will, therefore, be disregarded, although we may say that the speed of the car does not appear to have had anything to do with the accident in this case.

Testimony was had to show that Schulingkamp was a large man approximately 200 pounds in weight, presumably for the purpose of showing that the space within which he was obliged to protect himself was too restricted. The evidence shows that the space between the centers of the tracks and, therefore, between the sides of the cars on adjoining tracks, was ample for any man. Under any circumstances, Schulingkamp had been a brakeman using these tracks daily for eight years and was always able to protect himself within this space, so that it could not have been inadequate for the purpose. There is nothing whatever to show that the car kicked or the tender of the Belt train was of abnormal proportions insofar as its extensions are concerned.

Having found the defendant free from primary negligence, it is unnecessary to go into a discussion of the plea of contributory negligence as such.

The judgment of the district court is, therefore, annulled, avoided and reversed, and it is now ordered that plaintiff's suit be dismissed at her cost in both courts.